**UNITED AGRI–PRODUCTS FINAN-CIAL SERVICES, INC., Appellant (Defendant),**

**Rocky Mountain Feed & Grain, Inc., (Defendant),**

**v.**

**O'S GOLD SEED COMPANY, an Iowa corporation, Appellee (Plaintiff).**

**No. 86–172.**

Supreme Court of Wyoming.

Feb. 25, 1987.

Frank J. Jones of Jones & Weaver, P.C., Wheatland, for appellant.

Eric M. Alden of Jones, Jones, Vines & Hunkins, Wheatland, for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

Appellee O's Gold Seed Company (O's Gold) filed an action in district court to recover possession of personal property.

From a judgment in favor of O's Gold, United Agri-Products Financial Services, Inc. (UAP) appeals to this Court.

We reverse and remand.

UAP sets forth the following issues for our determination:

"A. WAS THE SECURITY INTEREST OF UNITED AGRI PRODUCTS FINANCIAL SERVICES, INC., IN SEED SOLD AND DELIVERED TO ROCKY MOUNTAIN FEED & GRAIN, INC., BY O'S GOLD SEED COMPANY SUPERIOR TO ANY CLAIM OF O'S GOLD SEED COMPANY?

"B. DID THE SETTLEMENT OF FOREIGN LITIGATION WHEREIN UNITED AGRI PRODUCTS FINANCIAL SERVICES, INC., WAS PLAINTIFF AND ROCKY MOUNTAIN FEED & GRAIN, INC., WAS DEFENDANT RELEASE THE SECURITY INTEREST UNITED AGRI PRODUCTS FINANCIAL SERVICES, INC., HAD IN THE SEED BELONGING TO ROCKY MOUNTAIN FEED & GRAIN, INC.?"

O's Gold states the issues as follows:

"THE APPELLEE'S INTEREST IN THE SEED WAS PROTECTED FROM APPELLANT'S CLAIMED SECURITY INTEREST BY THE EXCEPTIONS CONTAINED IN § 34–21–243 (c) (i & ii), W.S., 1977.

"APPELLEE COMPLIED WITH THE PROVISIONS OF § 11–12–105 W.S., 1977 REQUIRING IT TO EVIDENCE ITS IDENTITY AS THE ACTUAL SELLER OF THE SEED ON THE BAG LABEL.

"THE APPELLEE ESTABLISHED ROCKY MOUNTAIN WAS GENERALLY KNOWN BY ITS CREDITORS TO BE SUBSTANTIALLY ENGAGED IN SELLING SEED OWNED BY OTHERS.

"THE APPELLANT'S CLAIMED SECURITY INTEREST IN THE SEED WAS EXTINGUISHED WHEN THE UNDERLYING DEBT WAS SATISFIED.

"ANY ERROR BY THE TRIAL COURT WAS HARMLESS ERROR IN LIGHT OF THE APPELLANT'S FAILURE TO

PRESENT ANY EVIDENCE OF DAMAGES."

O's Gold is an Iowa corporation engaged in the business of selling agricultural seed in Wyoming. In the fall of 1983, O's Gold met with Rocky Mountain Feed & Grain, Inc. (Rocky Mountain), a general retailer of farm and ranch supplies in Platte County, Wyoming. As a result of their meeting, O's Gold and Rocky Mountain entered into an agreement whereby O's Gold agreed to deliver a specified quantity of seed to Rocky Mountain for resale to area farmers and ranchers for the 1984 crop season. The agreement also provided that, at the end of the season, Rocky Mountain would pay O's Gold for the seed sold during the year, receive a commission for the seed sold, and return to O's Gold any seed which remained unsold.

Pursuant to the terms of the agreement, O's Gold delivered the seed to Rocky Mountain. At the end of the 1984 season, Rocky Mountain paid O's Gold for the seed sold during the year and returned to O's Gold any seed which remained unsold. The same procedures were followed the next year.

Meanwhile, in December of 1984, Rocky Mountain obtained financing for its retail operations from UAP. Rocky Mountain signed a financing agreement and a financing statement in which it pledged its inventory and accounts receivable to UAP as security for the indebtedness.

In June of 1985, after experiencing financial difficulties, Rocky Mountain closed its business. At the time of closing, Rocky Mountain had in its possession a portion of the seed delivered to it by O's Gold.

On July 15, 1985, O's Gold filed a complaint in district court in which it prayed for an order determining it to be entitled to possession of the seed and an order directing Rocky Mountain and UAP to relinquish the seed to O's Gold. In its answer, UAP alleged as an affirmative defense that it was entitled to the seed because it filed the appropriate security instrument with the county clerk. On September 3, 1985, the district court issued an order for delivery commanding the sheriff to take possession of the seed from Rocky Mountain and to deliver it to O's Gold.

Sometime prior to trial on O's Gold's complaint, UAP filed suit against Rocky Mountain on the debt underlying its security interest defense. On April 18, 1986, UAP settled its claim against Rocky Mountain. Pursuant to the settlement agreement, judgment was entered in favor of UAP on April 18, 1986.

A trial to the court on O's Gold's complaint against Rocky Mountain and UAP was held on May 1, 1986. O's Gold attempted to show that the seed was sold to Rocky Mountain on consignment and that the seed was exempt from the claims of creditors under § 34-21-243(c), W.S.1977. That section provides as follows:

"(c) Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return. The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum.' However, this subsection is not applicable if the person making delivery:

"(i) Complies with an applicable law providing for a consignor's interest or the like to be evidenced by a sign; or

"(ii) Establishes that the person conducting the business is generally known by his creditors to be substantially engaged in selling the goods of others; or

"(iii) Complies with the filing provisions of the article on secured transactions (article 9)."

In addition, O's Gold attempted to show that UAP's claim against Rocky Mountain had been fully and completely settled by the prior judgment.

In contrast, UAP attempted to show that the seed was sold outright to Rocky Mountain and, consequently, that it was inventory subject to the security agreement. In the alternative, UAP attempted to show that, even if the seed was sold on consignment, it was subject to the security agreement because it did not come within the exceptions provided in § 34–21–243(c).

At the close of the evidence, the district court found that:

"The consignor complied with Section 34–21–243 Wyoming Compiled Statutes in that (1) every bag of seed displayed the following statement[:] 'Seed sold through Agents remains the property of [O's Gold] Seed Company until delivered to the customer.' This notice substantially complies with [paragraph] (i) of Wyoming Statute 34–21–243[ (c).] (2) Rocky Mountain Feed had been selling seed and other products for various companies on consignment and this information was known or should have been discovered by the Defendant (WS [3]4–21–243[ (c) ](ii)). Lastly, UAP settled [its] claim with Rocky Mountain Feed. The settlement provided for the payment of money and assignment of accounts receivable in settlement of UAP['s] claim against Rocky Mountain Feed. This appears to the court to be in full satisfaction of the debt of Rocky Mountain to UAP."

## I

In its first claim before this Court, UAP argues that the seed sold by O's Gold to Rocky Mountain was sold outright and, consequently, that it was inventory subject to UAP's security interest. The agreement entered into by Rocky Mountain and O's Gold on October 26, 1983, specifically provided:

"THE UNDERSIGNED O's GOLD SEED DEALER [Rocky Mountain] AND O's GOLD SEED COMPANY AGREE TO CARRY OUT THE OBLIGATIONS COVERED IN THIS AGREEMENT. DEALER AGREES TO CONFORM TO THE POLICIES OF O's GOLD * * *.

" * * * Dealer agrees to represent and offer for sale O's Gold seed product line and associated products. * * *

" * * * Dealer agrees to call on all potential customers in his territory to sell, collect for an[d] promote the products of the Company * * *.

* * * * * *

" * * * Seed corn, sunflower, and sorghum seed [are] delivered to the Dealer on *consignments* and can be returned * *." (Emphasis added.)

The agreement for 1984 also provided:

"The parties mutually agree to:

"1. Adhere to the provisions written in the * * * O's Gold Sales Agent Policies and Procedures."

The manual on sales agent policies and procedures provides in relevant part: "The Company retains ownership of the seed until the customer accepts delivery." On the basis of that provision, UAP argues that Rocky Mountain was O's Gold's customer. However, the manual goes on to state that:

"The Company will set prices, terms, and conditions that are fair to all customers. The Sales Agent is not permitted to depart from those prices, terms, and conditions.

"The Sales Agent invoices the customer at time of delivery * * *.

"The Sales Agent is expected to obtain cash upon delivery but shall not be liable for the customer's account payable to the Company if the Sales Agent has provided the [C]ompany with a customer signed delivery invoice."

The language of these provisions is clear and unambiguous. When considered together, the provisions clearly contemplate the involvement of three separate and distinct entities—the company, O's Gold; a sales agent or dealer, Rocky Mountain; and a customer, the farmer to whom Rocky Mountain sold O's Gold's seed. In addition, the language clearly provides that, although O's Gold gives up possession of the seed, it retains ownership until acceptance of delivery by a farmer and retains the

right to set prices, terms, and conditions of sale. Thus, Rocky Mountain was not the customer within the meaning of the agreements, and the arrangement was clearly a consignment.

## II

UAP next contends that, even assuming that the seed was sold to Rocky Mountain on consignment, O's Gold failed to prove that it fell within one of the exceptions contained in § 34–21–243(c). As a result, UAP claims the seed is subject to the security agreement signed by Rocky Mountain.

UAP's argument presumes that the consignment falls under the provisions of Article 2 of the Uniform Commercial Code. However, both Articles 2 and 9 of the Uniform Commercial Code contain sections concerning consignments. The distinction commonly made is that a consignment " 'intended as security' " falls within the scope of Article 9, while a " 'true' " consignment is regulated by Article 2. Winship, *The "True" Consignment under the Uniform Commercial Code, and Related Peccadilloes*, 29 Southwestern Law Journal 825, 838 (1976). A true consignment is said to be one in which the consignor retains extensive control over the goods but gives up possession with the intent that they be sold to a third party and in which the consignee may return the goods at any time and is not obligated to pay a fixed price for them. Id., at 857.

The present consignment satisfies the description of a true consignment. However, the agreement between Rocky Mountain and O's Gold expressly incorporated the terms of O's Gold's sales agent policy manual which provides in relevant part:

"The Sales Agent [Rocky Mountain] agrees to grant the Company [O's Gold] a security interest in all * * * O's Gold labelled products now held or hereafter sold * * *."

Thus, the consignment not only fulfilled the description of a true consignment but also was intended to create a security interest.

As a number of authorities have noted, the determination of whether a consignment falls within the scope of Article 2 or Article 9 "is fraught with uncertainty." White & Summers U.C.C.2d HB § 22–4 at 883 (1980). See also 8 Hawkland, Lord & Lewis UCC Series, §§ 9–114:01 through 9–114:05 (Art. 9); 29 Southwestern Law Journal, supra, at 825; Annot., 40 A.L.R.3d 1078 (1971). That statement is particularly true in the present case. However, because O's Gold failed to comply with the requirements of either article, we find it unnecessary to engage in a lengthy discussion concerning the proper application of Articles 2 and 9.

There is no contention that O's Gold complied with the relevant filing provisions of Article 9; therefore, O's Gold is not entitled to the seed under Article 9 or under Article 2, § 34–21–243(c)(iii). In addition, upon reviewing the record, we find the evidence insufficient to demonstrate that Rocky Mountain was generally known by its creditors to be substantially engaged in selling the goods of others as required in paragraph (ii) of § 34–21–243(c). In its brief, O's Gold states: "The business of selling agricultural seed is almost universally handled on a consignment or sales agent basis." Yet there is no evidence in the record supporting that claim. That all the seed companies with which Rocky Mountain dealt transacted business in this manner would not be sufficient to establish that Rocky Mountain was generally known by its creditors to be in the business of selling the goods of others. Likewise, evidence that UAP is in the business of lending to agricultural-oriented businesses and has approximately 120 farm supply customers fails to satisfy § 34–21–243(c)(ii). Finally, the testimony given by an agent of UAP that he was not with UAP at the time but "[i]t's possible" that Rocky Mountain informed UAP that the seed was consigned does not satisfy O's Gold's burden. Absent additional evidence, we are unable to find that O's Gold satisfied the requirements of § 34–21–243(c)(ii).

Evidence was presented at trial that each bag of seed was labeled "Seed sold through Agents remains the property of [O's Gold] Seed Company until delivered to the customer." O's Gold contends that such labeling constitutes compliance with paragraph (i) of § 34–21–243(c). Were we to accept O's Gold's claim and hold that such labeling removes goods from the reach of creditors, we would be placing upon creditors the onerous and perhaps ineffectual task of inspecting the property of their debtors prior to extending credit. Thus, we join the vast majority of jurisdictions which have declined to extend protection to the consignor absent a state sign law specifically intended for that purpose. 8 Hawkland, supra, at 358–59. The statute upon which O's Gold relies [1] was enacted along with the other provisions of Title 11 for the purpose of regulating noxious weeds in Wyoming. It simply does not constitute a sign law within the meaning of § 34–21–243(c)(i).

Our holding is also influenced by the terms of the policy manual cited earlier which provided that O's Gold retained a security interest in the seed. As indicated earlier, if the intent was truly to create a security interest, O's Gold had to comply with the filing requirements of Article 9 in order to perfect its interest.

### III

Having found that O's Gold did not comply with the applicable provisions of Article 2 or Article 9 of the Uniform Commercial Code, we turn next to the question of whether UAP's claim to the seed was extinguished by the terms of its settlement agreement with Rocky Mountain and the resulting judgment.

The settlement agreement provides in pertinent part:

"As full settlement of this matter, the parties agree as follows:

"1. [Rocky Mountain has] paid unto [UAP] the sum of $25,000.00 * * *.

"2. [Rocky Mountain] shall permit judgment in the amount of $15,000.00 to be entered on [UAP's] Complaint.

"3. [Rocky Mountain has] assigned all [its] accounts receivable * * * unto [UAP], which is now the holder of the accounts. [Rocky Mountain] shall have the obligation and will pursue good faith efforts to collect all the accounts receivable with all amounts collected being immediately delivered to [UAP]. [Rocky Mountain] shall receive a credit against the $15,000.00 judgment entered pursuant to [P]aragraph 2, equal to 20% of any amount collected and delivered. * * *

"[Rocky Mountain] will obtain and sell for the benefit of [UAP] all that inventory and merchandise now held by Jim Rumrey located in Riverton, Wyoming. All amounts received shall be immediately delivered to [UAP]. [Rocky Mountain] shall receive a credit against the $15,000.00 judgment entered pursuant to Paragraph 2, equal to 20% of any amount collected and delivered.

"[4. Rocky Mountain] will provide all required assistance to [UAP] in that case now pending in this Court as Civil Action No. 17–206 wherein O's Gold Seed Company is named as Plaintiff and Rocky Mountain Feed & Grain, Inc., and United Agri Products Financial Services, Inc., are named as Defendants. If requested the individual Defendants shall appear as witnesses on behalf of United Agri Products Financial Services, Inc., in said case."

It has been said:

"[A settlement] agreement is conclusive only as to those matters which the parties have fairly intended to include within its terms * * *." 15A C.J.S., Compromise and Settlement § 27 at 235–36 (1967).

"[I]f the alleged settlement is tentative and conditional on the result of some subsequent act or event, it is not conclusive." Id., § 26 at 235.

"As a general rule, * * * third persons not parties to a * * * settlement are not

---

**1.** Section 11–12–105, W.S.1977.

entitled to any of the benefits arising therefrom, and cannot set up as a bar to an action against them a settlement not made for their benefit, and to which they were not privies." Id., § 24 at 228–29.

Applying these rules to the present case, we find that the settlement agreement did not extinguish UAP's claim to the seed held by O's Gold. It simply cannot be said that UAP and Rocky Mountain fairly intended that the agreement be conclusive as to the seed which was the subject of the action filed by O's Gold. The settlement agreement clearly contemplated that, with the assistance of Rocky Mountain, UAP would continue to assert its right to the seed in the action filed by O's Gold. In addition, because O's Gold was not a party to the settlement, we find that it is not entitled to claim that the settlement agreement extinguished UAP's claim to the seed.

Reversed and remanded for further proceedings consistent with this opinion.